IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NU-WEST MINING INC., and NU-WEST INDUSTRIES INC.<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | Case No. 4:CV 09-431-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

The Court has before it a motion for partial summary judgment filed by plaintiffs Nu-West Mining Inc. and Nu-West Industries Inc. (hereinafter Nu-West). The Court heard oral argument on January 25, 2011, and took the motion under advisement. For the reasons expressed below, the Court will grant the motion.

# FACTUAL BACKGROUND

Plaintiff Nu-West seeks to impose on the defendant Government the costs of cleaning up selenium contamination at four mine sites in the Caribou-Targhee National Forest. This suit is brought under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675. Nu-West's motion for partial summary asks the Court to find the Government liable under certain provisions of CERCLA, but leaves issues of the Government's defenses and damages to

**Memorandum Decision & Order - 1**

later litigation.

In 1949, after determining that lands in the Caribou National Forest had phosphate deposits large enough to warrant mining, the Government began awarding mining leases through a competitive bidding process. Through these leases, the Government authorized the Lessees to mine phosphate ore at the Mine Sites. The four mines that arose from these leases – and are the focus of this lawsuit – are the South Maybe Canyon Mine, the North Maybe Mine, the Champ Mine and Champ Mine Extension, and the Mountain Fuel Mine.

The leases ran for twenty years, and the Government retained the authority to terminate the leases "whenever the lessee fails to comply with any of the provisions of this chapter, of the lease, or of the general regulations promulgated under this chapter and in force at the date of the lease." *See* 30 U.S.C. § 188(a). In addition to the lands covered by mining leases, the United States issued to the Mine Site Lessees a number of Special Use Permits ("SUPs") so that waste rock dumps could be constructed on National Forest lands adjacent to the leased lands.

From at least 1965 to the present, the Government has monitored environmental conditions at the Mine Sites, including water quality sampling and other hydrology studies. The Government also required the Lessees to allow mine inspections to ensure, among other things, that the Lessee was properly disposing of mining waste and paying a full royalty to the Government. The Government reserved for itself all of its property rights in the Mine Sites, except that it granted to the Lessees the limited right to mine for

**Memorandum Decision & Order - 2**

phosphate, phosphate rock, and related minerals. The Government required the Lessees to prospect diligently and to meet certain ore production requirements, and also to pay a royalty fee.

Before any mining could begin, the Government required the Lessees to obtain its approval of plans for mining, waste disposal, and reclamation. The United States conditioned its approval of mine plans on requiring the Lessees to perform specific reclamation activities at the Mine Sites, including locating, designing, and shaping waste rock dumps, covering waste dumps with a layer of middle waste shale as a growth medium, and planting specific seed mixtures on the waste dumps.

The four mines operated from roughly the 1960s to the 1990s. Each of the mine sites is contaminated with a hazardous substance known as selenium. A naturally occurring chemical element, selenium is found in a rock layer between phosphate ore zones. This rock layer is known as "middle waste shale," and it was hauled out of the mines in the process of digging through the first phosphate ore zone to get to the second.

The middle waste shale was placed on top of every waste rock dump constructed at all four of the mine sites. It was intended to promote revegetation on the dumps, but the selenium leached into the environment. Waste dumps associated with the South Maybe Canyon Mine and North Maybe Mine were placed over water sources. These dumps were known as cross valley fill (CVF) dumps because they filled the valley side-to-side and covered stream beds at the valley bottom. The CVF dumps had a rock drain – known as a french drain – that allowed water to flow underneath the dump, and were covered

**Memorandum Decision & Order - 3**

with middle waste shale.  The selenium leached from the middle waste shale down through the french drain and into the flowing water beneath.

The four mines are all currently leased to Nu-West.  When the selenium contamination was discovered in the late 1990s, Nu-West entered into Administrative Orders of Consent with the Government to remediate the sites.  Nu-West claims to have spent $10 million to date on those remediation efforts, and seeks to recoup those costs in this CERCLA action.

Nu-West's motion for partial summary asks the Court to find that the Government is an owner, arranger, and operator of the waste disposal sites as those terms are defined by CERCLA and its associated case law.  The motion does not seek to resolve issues about the Government's defenses listed under CERCLA or any damage issues, and the Court has accordingly not addressed those issues in this decision.

## SUMMARY JUDGMENT – GOVERNING STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e). In order to preserve a hearsay objection, "a party must either move to strike the affidavit or otherwise lodge an objection with the district court." *Pfingston v. Ronan Engineering Co.,* 284 F.3d 999, 1003 (9th Cir. 2002). In the absence of objection, the Court may consider hearsay evidence. *Skillsky v. Lucky Stores, Inc.,* 893 F.2d 1088, 1094 (9th Cir. 1990).

# ANALYSIS

## CERCLA Liability Standards

CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (en banc). To achieve that end, CERCLA "authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation." *Id.*

To prevail in this CERCLA cost recovery action, Nu-West has the burden of proving the following elements: (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, 42 U.S.C. § 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. § 9607(a)(4); (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. §§ 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of CERCLA, 42 U.S.C. § 9607(a). *Carson Harbor,* 270 F.3d at 870-71. The Government does not dispute that Nu-West has established the first three elements. Thus, the only issue for resolving this motion is whether the Government is a "potentially responsible party" (PRP) under the fourth element.

An entity is labeled a PRP pursuant to § 9607(a) if it falls into any of the following four categories: (1) the current owners or operators of a facility where hazardous

substances were disposed of; (2) those who owned or operated such a facility at the time of a disposal; (3) those who arranged for the disposal of hazardous substances at such a facility; and (4) those who transported hazardous substances at such a facility.

The Government has admitted being an "owner" for purposes of CERCLA liability under 42 U.S.C. § 9607(a)(1) and (2). *See Defendant's Response Brief (Dkt. 49)* at p. 1. Nu-West seeks summary judgment that the Government is also an "arranger" and an "operator."

**Arranger Liability**

Because CERCLA does not specifically define what it means to "arrange for" disposal of a hazardous substance, the Supreme Court interpreted the phrase to mean someone who "takes intentional steps to dispose of a hazardous substance." *See Burlington Northern and Santa Fe Ry. Co. v. U.S.*, 129 S.Ct. 1870, 1879 (2009). An entity is an arranger if it has "direct involvement in arrangements for the disposal of waste." *U.S. v. Shell Oil Co.,* 294 F.3d 1045, 1055 (9th Cir. 2002). Elements to consider include whether the entity (1) owns the hazardous substance; (2) had the authority to control the disposal of that substance; and (3) exercised some actual control over the disposal of that substance. *Id.* at 1055-60.

The undisputed facts show that all three elements are present here, along with the intent element required by *Burlington Northern*. The Government owned the source of

the hazardous selenium, the middle waste shale.[1] At all times, the Government had the authority to control the disposal of the mining waste on the land it owned in the Caribou-Targhee National Forest – no mining or waste disposal could occur without its approval. Finally, the Government exercised actual control over the disposal – and showed its intent that the disposal take place – by requiring its lessees to cover the outer surface of the waste dumps with a layer of middle waste shale. For example, the Approval Stipulations governing the Lessee's mining activities state that "as a condition to the approval" of mining, the reclamation areas "will be . . . covered with a minimum of 5 feet of middle waste shale." *Exhibit 90* at N-W0100400. This was required at all four mine sites. Thus, the Government fits all the criteria listed above for arranger liability.

The Government's expert, Timothy LeCain, concluded that "[a]t all four mines sites, the Lessees chose to use middle waste shale, which was readily available as it was a primary component of the waste rock dumps" and that the Government "preferred the use of topsoil." *See Declaration of LeCain* at p. 6, ¶¶ 32, 35. LeCain asserts that "[t]he 'requirement' that the Lessees use middle waste shale as a vegetation substrate was nothing more than the requirement that the Lessees honor their promise to revegetate using middle waste shale." *Id*. at ¶ 35.

Assuming, without deciding, that LeCain is correct, it makes no difference to the

---

[1] The Government states in its briefing that it "assume[s] without conceding that the United States owns" the middle waste shale. *See Response Brief (Dkt. 49)* at p. 16. The Government has admitted being an owner under CERCLA's PRP provision, and has produced nothing to indicate that it did not own the middle waste shale. Accordingly, the Court found above that it is undisputed that the Government owns the middle waste shale.

**Memorandum Decision & Order - 8**

liability provisions of CERCLA. The Government cites no authority holding that arranger liability depends on who originated the disposal method. Whoever devised the idea of using middle waste shale to cover the dumps, the Government's own documents show that it required this disposal as a condition of mining approval. That is sufficient for arranger liability.

The Government argues that in engaging in the conduct described above, it was acting in a purely regulatory role, taking actions "aimed only at *mitigating* the environmental harm caused by private parties' actions . . . ." *See Response Brief (Dkt. 49)* at p. 15 (emphasis in original). This argument, however, has been rejected in this Circuit. *Shell Oil*, 294 F.3d at 1052-54. That case began its analysis by citing CERCLA's waiver provision – at 42 U.S.C. § 9620(a)(1) – and finding that it contained "an unambiguous waiver of the sovereign immunity of the Government." *Id*. at 1052. In *Shell Oil*, the Government argued that this waiver does not apply when the Government acts in a governmental capacity, akin to their argument here that they cannot be liable for purely regulatory activity. The Circuit found no support for that argument in CERCLA or the case law, noting that the Government has repeatedly been held liable under CERCLA for acts that "cannot possibly be characterized as 'nongovernmental.'" *Id*. at 1053. For example, the Circuit noted, private parties do not operate military bases and yet the Government has been found liable for the cleanup of hazardous wastes at military facilities. *Id*. Rejecting the "governmental" defense, the Circuit held that CERCLA's waiver of sovereign immunity is coextensive with the scope of liability imposed by

**Memorandum Decision & Order - 9**

CERCLA – if CERCLA "provides for liability then § 9620(a)(1) waives sovereign immunity to that liability." *Id*. at 1053.

*Shell Oil's* rejection of the "governmental" defense applies with equal strength to the "regulatory" defense raised here. Congress could have easily included a regulatory exception to the broad waiver of sovereign immunity contained in CERCLA but did not do so.

As discussed above, the undisputed facts show that the Government was an arranger under 42 U.S.C. § 9607(a)(3). Under *Shell Oil*, the Government has waived its sovereign immunity to the full extent of its liability as an arranger. Accordingly, the Court will grant Nu-West's motion for partial summary judgment to this extent it seeks to impose arranger liability on the Government.

**Operator Liability**

To be an "operator" under CERCLA, one "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *U.S. v Bestfoods*, 524 U.S. 31, 66-67 (1998). CERCLA operator liability "attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment" and actually exercised such control. *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp*., 976 F. 2d 1338, 1341-42 (9th Cir. 1992); *see also Coeur D'Alene Tribe*, 280 F. Supp. 2d at 1126 (applying *Bestfoods* and *Catellus*, focusing on the "requirement of control over the cause

of the contamination").

In this case, the record shows conclusively that the Government was managing the design and location of the waste dumps for the four mines. For example, in 1972, Forest Service Engineer H.C. Ames, speaking of the South Maybe Canyon Mine, stated that "I also designed for consideration a dump in the head of Maybe Canyon." *See Exhibit 22.* Early on, it appeared that the Lessee intended to put most of the waste in a dump in Maybe Canyon, a proposal that appealed to the federal agencies because it was "virtually out of sight . . . ." *See Exhibit 30.* But when the Lessee proposed to put two waste dumps just below the ridge line between Maybe Canyon and Dry Valley, in a highly visible location, the Forest Service's Bill Paller expressed his strong disagreement by telling the Lessee "you'll do it our way or not at all." *Id.; see also Kross Deposition* at 62-71, 146. In 1975, officials from the Forest Service and the Geological Survey met, without the Lessees, to discuss at length the waste dump designs and locations. *See Exhibit 36.* At that meeting, the Forest Service expressed disagreement with the Lessee's plan for a dump within South Maybe Canyon and so "began a complicated redesign of the dump." *Id.* As a result of that meeting, and a meeting the next day, the District Mining Supervisor noted that the Lessee "will be requested to redesign the South Maybe Canyon Dump." *Id.* In 1977, the Forest Service told the Lessee that "we'd like to see the following steps taken" regarding the drain in the waste dump, and included 14 detailed proposals. *See Exhibit 46.* In 1978, the District Mining Supervisor stated that the ridge-line waste dumps proposal had been revised due to soil instability and "scenic vista

Memorandum Decision & Order - 11

problems," and that the new valley locations were "in the Government's best interest." *See Exhibit 52.*

In addition, it is undisputed that the Government regularly inspected the mines to ensure compliance with the mining plans and waste disposal guidelines. For example, during an inspection of the North Maybe Mine, Forest Service officials met with the Lessee and "it was decided" that there "would be no more dumping on the lower level of the waste dump," among other decisions affecting the waste dump. *See Exhibit 71.* As another example, in 1979 during an inspection regarding the South Maybe Canyon Mine, Ed Connors of the Forest Service stated that "high priority" needs to be given to a section of the french drain in the waste dump, and directed the mining contractor to "bulldoze chert from the high drain northward into the gap area, and possibly from the lower blanket southward into the gap area." *See Exhibit 62.* Connors also "indicated strongly that he feel [sic] that the chert French drain should go in at the 7120 foot level and built [sic] north." *Id.* On July 18, 1979, with regard to the same mine, the Forest Service told the Lessee that the waste dump "concept and the dump itself . . . [is] in some jeopardy." *See Exhibit 61.* The Forest Service had observed cracks in the french drain, and was concerned with both actual and threatened landslides in the waste dump area which "occurred due to a lack of supervision on the part of the operation." *Id.* Based on this inspection, the Forest Service directed the Lessee to take four specific actions with regard to the waste dump, including "fill with chert the v-shaped slot between the chert drain [in the waste dump] and the original ground to the east." *Id.*

The documents show that this level of Government involvement occurred at all four mine sites. The Government does not dispute this evidence but argues that "[w]here the United States suggested modifications in light of requirements imposed by law and the Lessees' leases, permits and mine plans, it did so as a regulator to ensure compliance with those provisions." *See Response Brief (Dkt. 49)* at p. 17.[2] However, the Court has already discussed the Circuit's rejection of this "regulator" defense in *Shell Oil*. As to the Government's claim that it was merely making "suggestions" rather than orders, the difference is irrelevant. Either way, the Government was actively involved in the design and location of the waste dumps, and in ensuring that the waste dumps complied with the mining plans and environmental rules. That is sufficient, as a matter of law, for operator liability. *Bestfoods*, 524 U.S. at 66-67 (holding that operator liability attaches if the entity is managing or directing "operations having to do with leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations").

Moreover, the "suggestions" of a federal agency with final approval authority over

---

[2] In a briefing footnote, the Government complains generally about Nu-West relying on documents containing hearsay within hearsay, and identifies as an example a document written by a Lessee employee recalling statements of a Forest Service official. The Court did not rely on that document, however. In recounting the actions of the Government above, the Court has relied almost entirely on numerous documents written by Government employees. Their statements are not hearsay. *See Fed.R.Evid. 801(d)(2)*. The Government does not specifically object to any of their own documents relied upon by the Court. The Court does rely on a statement by a Lessee's employee, Arel Bowles. The Court used the statement to establish what action Bowles took, not to establish the statements or conduct of any Government official. There cannot be any hearsay objection to using Bowles's deposition testimony to establish his own conduct. The Court also relied on the deposition testimony of Burton Kross, a non-governmental employee who testified about a statement he heard made by the Forest Service's Bill Paller. Paller's statement is not hearsay under Rule of Evidence 801(d)(2).

**Memorandum Decision & Order - 13**

a mining operation carry some weight. Arel Bowles, an employee of a Lessee for thirty years, testified that "[i]f the Forest Service Representative said he wanted something, that's the way it was. And when a federal agency did an official inspection and they saw something they wanted done differently, we did it that way." *See Bowles Deposition* at p. 68.

Looking over the same Government conduct that the Court cites above, the Government's expert LeCain reaches this conclusion:

> In general, the role of federal employees inspecting mines was limited to ensuring that the Applicable Requirements were being met. Whether this can be called "supervision" or "direction" is a matter of semantics. In one sense, the inspectors supervised, i.e., watched over the operations. But these inspectors did not direct the day to day activities of the mine. Moreover, the federal inspectors "directed" or "controlled" only to the extent that the Lessees were violating, or were in danger of violating, the Applicable Requirements. As long as the Lessees' operations were not in violation, there was no direction or control to be given or exercised.

*See LeCain Declaration (Dkt. 51)* at p. 4, ¶ 20. But LeCain's opinion that the Government simply "watched over the operations" is conclusively refuted by the Government's own documents cited above. The Government was a very active participant in designing and locating the waste dumps, in inspecting mining operations, and in ensuring compliance with all rules and plans. As discussed above, even if the Government's directions could be called "suggestions," those suggestions often got instant results. When the Government's directions met resistance from the Lessee, and negotiations resulted in some compromise, the Government was still actively managing the disposal of hazardous waste through the negotiation process.

The undisputed facts show that the Government was an operator under 42 U.S.C. § 9607(a)(3). Under *Shell Oil*, the Government has waived its sovereign immunity to the full extent of its liability as an operator. Accordingly, the Court will grant Nu-West's motion for partial summary judgment on both the arranger and operator liability issues.

## Conclusion

This decision awards only a partial summary judgment because it merely resolves particular issues relating to liability. The Court did not consider any damage issues, and did not consider the defenses set forth at 42 U.S.C. § 9607(b) or the issues raised any of the subsections that follow. Because this decision deals only with issues related to liability, it is narrow in scope and has no precedential value for the next phase of this litigation beyond its finding that the Government is an owner, operator and arranger for purposes of 42 U.S.C. § 9607(a).

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that Nu-West's motion for partial summary judgment (docket no. 35) is GRANTED.

IT IS FURTHER ORDERED, that the defendant United States is deemed an owner, operator, and arranger for purposes of 42 U.S.C. § 9607(a) with regard to the CERCLA clean up costs sought in this case associated with the South Maybe Canyon Mine, the North Maybe Mine, the Champ Mine and Champ Mine Extension, and the Mountain Fuel Mine.

DATED: **March 4, 2011**



_____
Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order - 16**